Timothy CAHILL, Defendant-Below, Appellant,

v.

STATE of Delaware (Bureau of Child Support Enforcement ex rel. Justine Thomas), Plaintiff-Below, Appellee.

Conrad WILLIAMS, Defendant-Below, Appellant,

v.

Barbara A. ROANE, Plaintiff-Below, Appellee.

Superior Court of Delaware, New Castle County.

Submitted Jan. 4, 1980.

Decided Jan. 30, 1980.

**318**

David C. Carrad, Wilmington, for Cahill.

Arlen B. Mekler and Dennis J. Siebold, Wilmington, for Williams.

James A. Littman, Deputy Atty. Gen., for appellees.

BALICK, Judge.

These are appeals by the putative fathers of illegitimate children from support orders entered by the Family Court in civil enforcement proceedings under Title 13, Chapter 5, Subchapter II. 59 Del.Laws c. 567 (1974). The Supreme Court has recently held that the normal civil burden of proof by a preponderance of the evidence applies in these proceedings. *G. L. v. S. D.,* Del. Supr., 403 A.2d 1121 (1979). Two issues are raised here: (1) whether the appeals should go directly to the Supreme Court and (2) whether there is a constitutional right to a jury trial of the issue of paternity.

The appellees contend that appeals from Family Court support orders now go directly to the Supreme Court on the basis of the following provision in the 1974 act, at 13 *Del.C.* § 515:

"(a) All parties to a civil action brought pursuant to this chapter shall possess all procedural rights which such parties would have heretofore possessed in an action for support or separate maintenance in the Court of Chancery of the State, including but not limited to the . . . [r]ight to appeal to the Supreme Court of the State, on the record, from interlocutory or final orders or judgments. Such appeal shall be in the form and manner provided by the rules of the Supreme Court.

(b) For purposes of this section, a child born out of wedlock shall possess the same procedural rights as a child born in wedlock and the mother of a child born out of wedlock shall possess the same procedural rights as the mother of a child born in wedlock."

■ The Supreme Court has held that this means that there is the right of direct appeal to the Supreme Court only in cases formerly within the jurisdiction of the Court of Chancery. *Husband G. v. Wife G.,* Del.Supr., 379 A.2d 1111 (1977). Support of illegitimate children was not formerly within the jurisdiction of the Court of Chancery. *M. F. v. F.,* Del.Chanc., 172 A.2d 274 (1961). It is argued that appeal to Superior Court is inconsistent with paragraph (b) of the statute. See also, *G. D. v. State,* Del.Supr., 389 A.2d 764, 766 (1978): "support cases are heard by us on the record, 13 *Del.C.* § 515." This contention would have force unless there is a constitutional right to jury trial of the issue of paternity.

Appeals to this court are also decided on the record, unless otherwise provided by statute. Civil Rule 72(g). *Poe v. Poe,* Del. Super., 333 A.2d 403 (1975), appeal dismissed, Del.Supr., 348 A.2d 327 (1975). The 1974 act repealed 13 *Del.C.* 1953 c. 13, Subchapter II, which included the following provision, at § 1332:

"If the appellant, in the causes of appeal, denies that he is the father of the child, the Court shall, without further pleading, order this matter to be tried by a jury at the bar." (Code 1852, § 1484; Code 1915, § 3082; Code 1935, § 3568.)

Since there is no longer statutory provision for jury trial, appellants' demands for jury trial rest on the claim of constitutional right.

The claim is based on Art. I, § 4 of the Constitution of 1897, which says, "Trial by jury shall be as heretofore." The general rule is that state constitutional provisions preserve the right in substance as it existed when the guaranty was adopted. 47 Am. Jur.2d, Jury, § 17; 50 C.J.S. Juries § 10; *In re Markel,* Del.Supr., 254 A.2d 236 (1969).

The following good statement of the rule by Justice Strong, later of the U.S. Supreme Court, in *Byers and Davis v. Commonwealth,* Pa.Supr., 42 Pa. 89, 94 (1862), is especially significant because of the similarity of the colonial backgrounds and constitutional guaranties of Pennsylvania and Delaware:

"It is insisted that this act is repugnant to that clause in the declaration of rights in the constitution which guarantees 'that trial by jury shall be as heretofore, and the right thereof remain inviolate.' The objection is based upon a misconception of what that right of trial by jury was which is protected by the constitution. The founders of this state brought with them to their new abode the usages to which they had been accustomed in the land from which they emigrated. Among them was trial by jury. That mode of trial had long been considered the right of every Englishman, and it had come to be regarded as a right too sacred to be surrendered or taken away. Even in England it was fundamental or constitutional, so far as any right can be where there is no written frame of government. Its extent and its privileges, how and when it was to be enjoyed, were perfectly understood, and in bringing it with them the founders of the Commonwealth doubtless intended to bring it as they had enjoyed it. None of the frames of government or constitutions under which we have lived have contemplated any extension of the right beyond the limits within which it had been enjoyed previous to the settlement of the state or the adoption of the constitution. No intention to enlarge it appears in the laws agreed upon in England in 1682. Our first constitution, that of 1776, declared that 'trials by jury shall be as heretofore.'

The Constitution of 1790, and the amended one of 1838, adopted substantially the same provision. Their language was, 'trial by jury shall be as heretofore, and the right thereof remain inviolate.' All looked to preservation, not extension. It is the old right, whatever it was, the one previously enjoyed, that must remain inviolable, alike in its mode of enjoyment and in its extent. What, then, was this right thus cherished and thus perpetuated? We inquire not now after the mode in which such a trial was conducted. Our business at present is to ascertain how far the right to a trial by jury extended—to what controversies it was applicable. It was a right the title to which is founded upon usage, and its measure is therefore to be sought in the usages which prevailed at the time when it was asserted."

The historical nature of the test is well stated in *People v. One 1941 Chevrolet Coupe,* Cal.Supr., in Bank, 37 Cal.2d 283, 231 P.2d 832, 835 (1951) (citations omitted):

" 'The right of trial by jury shall be secured to all, and remain inviolate'. The right to trial by jury guaranteed by the Constitution, is the right as it existed at common law at the time the Constitution was adopted. The common law at the time the Constitution was adopted includes not only the lex non scripta but also the written statutes enacted by Parliament. The common law respecting trial by jury as it existed in 1850 is the rule of decision in this state. Any act of Legislature attempting to abridge the constitutional right is void. It is the right to trial by jury as it existed at common law which is preserved; and what that right is, is a purely historical question, a fact which is to be ascertained like any other social, political or legal fact. The right is the historical right enjoyed at the time it was guaranteed by the Constitution. It is necessary, therefore, to ascertain what was the rule of the English common law upon this subject in 1850."

The holdings in the Delaware decisions construing "trial by jury shall be as hereto-

fore" are based on this historical test. In *Nance v. Rees,* Del.Supr., 161 A.2d 795 (1960), the court traces the practice of using special juries back through an 1810 statute and a 1790 court rule to a statute enacted in England before the revolution. *State v. Fossett,* Del.Super., 134 A.2d 272 (1957) holds that there is a constitutional right to jury trial in forfeiture proceedings, which are civil in rem actions, although a criminal conviction is a condition precedent. *State v. Rossitto,* Del.Supr., 331 A.2d 385 (1974). In so holding, the court relied on *People v. One 1941 Chevrolet Coupe,* cited above, which traces forfeiture proceedings to their origin in statutes enacted in England before the revolution and shows that they were tried before juries. In *Hopkins v. Justice of the Peace Court No. 1,* Del.Super., 342 A.2d 243 (1975), the court traces jury trials in summary possession proceedings back through a 1793 statute to the common law action of ejectment.

I therefore turn to the history of actions for support against fathers of illegitimate children. The following is quoted from Clark on Domestic Relations (West Pub., Hornbook Series 1968) 162:

"It is often asserted that at common law a father had no duty to support his illegitimate child. Yet from as early as 1576 the Elizabethan Poor Law, by creating the strange hybrid called a bastardy proceeding, provided a method by which fathers could be forced to support their illegitimate children [footnote cites 18 Eliz. I, c. 3 (1576)]. The procedure looked criminal, commencing with the arrest of the defendant and including a preliminary hearing before a justice of the peace. Its chief purpose was not so much the protection of the child as the relief of the parish from the expense of supporting the child. Yet it did supply a remedy of sorts. Unfortunately legal conservatism preserved the ancient form when the remedy was brought to this country, thereby creating some wholly unnecessary problems and producing many harsh and unworkable consequences."

■ As used in the above quotation, "common law" means non-statutory law developed in the ordinary royal courts in England. See Hogue, *Origins of the Common Law* (Indiana Univ. Press 1966) chap. 8. Unless this is understood, confusion can result from ambiguous usage of the term. For example, it is often asserted that constitutional provisions preserve the "common law" right to jury trial. Here "common law" has a wider meaning. It includes rights and duties arising from statute, so long as actions enforcing them were tried by jury when the constitutional guaranty was adopted. See *People v. One 1941 Chevrolet Coupe,* quoted above. As Chief Justice Wolcott said in his speech, "Delaware's Legal Heritage," which may be found at the Delaware Historical Society (underlining added):

"The King's law, or common law, was a mixture of a variety of things—custom, Anglo-Saxon law, Norman law, usages, decrees of the King, and later statutes of Parliament. Once started, it grew as new and unusual situations were brought before the King's Judges for decision, until in the 16th Century it, generally speaking, solidified into a fairly complete set of fundamental legal principles."

The main events are here outlined in chronological order with important constitutional or statutory provisions quoted (all underlining has been added for emphasis):

1576–18 Eliz. c. 3:

"Concerning bastards begotten and born out of lawful matrimony, (an offence against God's law and man's law) the said bastards being now left to be kept at the charges of the parish where they be born, to the great burden of the same parish, and in defrauding of the relief of the impotent and aged true poor of the same parish, and to the evil example and encouragement of lewd life: (2) it is ordained and enacted by the authority aforesaid, That two justices of the peace (whereof one to be of the quorum, in or next unto the limits where the parish church is, within which parish such bastard shall be born, upon examination of

the cause and circumstance) shall and may by their discretion take order, as well for the punishment of the mother and reputed father of such bastard child, as also for the better relief of every such parish in part or in all; (3) and shall and may likewise by like discretion take order for the keeping of every such bastard child, by charging such mother or reputed father, with the payment of money weekly or other sustentation for the relief of such child, in such wise as they shall think meet and convenient: (4) and if after the same order by them subscribed under their hands, any the said persons, viz. mother or reputed father, upon notice thereof, shall not for their part observe and perform the said order; that then every such party so making default in not performing of the said order, to be committed to ward to the common gaol, (5) there to remain without bail or mainprise, except he, she or they shall put in sufficient surety to perform the said order, or else personally to appear at the next general sessions of the peace to be holden in that county where such order shall be taken, (6) and also to abide such order as the said justices of the peace or the more part of them then and there shall take in that behalf (if they then and there shall take any;) (7) and that if at the said sessions the said justices shall take no other order, then to abide and perform the order before made as is abovesaid."

1776—Declaration of Rights § 13:

"That trial by jury of facts where they arise is one of the greatest securities of the lives, liberties and estates of the people."

Constitution, Art. 25:

"The common law of England, as well as so much of the statute law as have been heretofore adopted in practice in this state, shall remain in force, unless they shall be altered by a future law of the Legislature; such parts only excepted as are repugnant to the rights and privileges contained in this constitution and the declaration of rights, & c. agreed to by this convention."

1792—Const., Art. I § 4: "Trial by jury shall be as heretofore."

1796—2 Del. Laws c. CVIII. c., p. 1304:

"Section 1. Be it enacted by the Senate and House of Representatives of the State of Delaware in General Assembly met, That from and after the passing of this act, it shall and may be lawful for any Justice of the Peace within this state, as often as he shall be informed of any female person having an illegitimate child, to issue his warrant to any Constable, who is hereby required to carry such person before some Justice of the Peace of the county, who shall call on her for security to indemnify the county from any charge that may accrue by means of such child, and upon neglect or refusal, to commit her to the custody of the Sheriff of the county, to be by him safely kept until she shall give such security; but in case she shall, on oath or affirmation, discover the father, then the said Justice is hereby required to discharge her from such warrant, and directed to call such father, if a resident of the county, before him, and shall cause him to give such security, in the sum of One Hundred and Sixty Dollars lawful money to indemnify the county from all charges that may arise for the maintenance of such child, and shall make an order for the lying-in expenses of the mother of said child, of not less than Four, nor more than Six Dollars, also an order for the monthly support of said child from the day of the birth thereof, until it shall arrive to the age of seven years, if so long chargeable, of not more than Two Dollars nor less than One Dollar per month; which order said justice shall enter on his docket, and transmit a copy thereof to the Clerk of the Peace, to be by him filed; which sums shall be paid by the said reputed father, monthly and every month, to the mother of said child, or other person or persons having the care thereof, and on neglect or refusal shall be recovered as other debts under Forty Shillings are recoverable;

. . .

Sect. 2. Provided always, and be it further enacted, That in case any person, charged with being the father of a bastard child, should think himself aggrieved by the judgment aforesaid, it shall and may be lawful for the said justice, and he is hereby required, to cause such person to enter into a recognizance, with one or more sufficient securities, in the sum of One Hundred and Sixty Dollars, for the appearance of the said person at the next Court of General Sessions of the Peace, and shall also oblige the mother to enter into a recognizance to appear as aforesaid; and the judges of the said court are hereby directed to take cognizance thereof, and such proceedings shall be had thereon as in other criminal cases; and if the person so charged be found guilty by the verdict of a jury, the court shall immediately order such person to give security to indemnify the county from any charges that may accrue for the maintenance of such child, and if he shall neglect or refuse to give such security, he shall be committed to the custody of the Sheriff until he comply; and any person swearing falsely in the premises, shall suffer the same pains and penalties as persons in other cases guilty of wilful and corrupt perjury.

\*   \*   \*   \*   \*   \*

Sect. 7. And be it enacted, That from and after the passing of this act, no fine, forfeiture, or corporal punishment, shall be inflicted on any person or persons within this state for bastardy or fornication; any law to the contrary notwithstanding."

1829—7 Del.Laws c. CXVIII., p. 227:
"An Act concerning the maintenance of bastard children

Section 1. Be it enacted by the Senate and House of Representatives of the State of Delaware in General Assembly met, That the justices of the peace of this State, severally, shall have jurisdiction of cases of bastardy. . . .

Any person, against whom an order shall be made as aforesaid, may appeal to the court of general quarter sessions of the peace and gaol delivery. . . .

If the appellant in the causes of appeal deny that he is father of the child, the court shall without further pleading, order this matter to be tried by a jury at the bar of the court. . . . ."

1831—Const., Art. I § 4: "Trial by jury shall be as heretofore."

1852—Code, § 1484 derives from 7 Del. Laws 227 (1829).

1897—Const., Art. I § 4: "Trial by jury shall be as heretofore."

1915—Code, § 3082 derives from Code 1852, § 1484.

1935—Code, § 3568 derives from Code 1915, § 3082.

1945—45 Del.Laws c. 241 § 4(g) confers exclusive original jurisdiction in the newly created Family Court of New Castle County. For Kent and Sussex counties, see 48 Del.Laws c. 364 (1951).

1951—48 Del.Laws c. 109 §§ 8, 9, 35 abolishes the Court of General Sessions, successor of the Court of General Sessions of the Peace and Jail Delivery, successor of the Court of General Quarter Sessions of the Peace and Jail Delivery, which existed since at least 1726–1736,[1] and transfers its jurisdiction to the Superior Court. Const.1831, Art. VI § 4; Const.1897, Art. IV § 7.

1953—Code, Title 13 § 1332, quoted above, derives from Code 1935, § 3568.

1974—59 Del.Laws c. 567 repeals the above.

In summary, there has been a statutory right to jury trial of the issue of paternity since 1796.

With regard to the practice before 1796, the records are less certain. Blackstone's Commentaries, published between 1764 and 1769, has the following relevant passages

---

1. An act establishing this court was enacted during the term of Patrick Gordon, Esq., Lieutenant Governor of the counties of New Castle, Kent, and Sussex, upon Delaware, and province of Pennsylvania, from 1726 to 1736. 1 Del. Laws c. LIV. a., p. 121; 1 Del.Laws 98, footnote (a); 1 Wooley on Del.Practice §§ 3, 4.

(selected footnotes in brackets; underlining added):

"Let us next see the duty of parents to their bastard children, by our law; which is principally that of maintenance. For, though bastards are not looked upon as children to any civil purposes, yet the ties of nature, of which maintenance is one, are not so easily dissolved: and they hold indeed as to many other intentions; as, particularly, that a man shall not marry his bastard sister or daughter. The civil law, therefore, when it denied maintenance to bastards begotten under certain atrocious circumstances, was neither consonant to nature nor reason, however profligate and wicked the parents might justly be esteemed.

The method in which the English law provides maintenance for them is as follows [18 Eliz. c.3 and later statutes]. When a woman is delivered, or declares herself with child, of a bastard, and will by oath before a justice of the peace charge any person as having got her with child, the justice shall cause such person to be apprehended, and commit him till he gives security, either to maintain the child, or appear at the next quarter-sessions to dispute and try the fact. But if the woman dies, or is married before delivery, or miscarries, or proves not to have been with child, the person shall be discharged; otherwise the sessions, or two justices out of sessions, upon original application to them, may take order for the keeping of the bastard, by charging the mother or reputed father with the payment of money or other sustentation for that purpose." Book I, Chap. XVI, II. 2.

"But, before we quit this subject, we must take notice of the temporal punishment for having bastard children, considered in a criminal light; for, with regard to the maintenance of such illegitimate offspring, which is a civil concern, we have formerly spoken at large. By the statute 18 Eliz. c.3, two justices may take order for the punishment of the mother and reputed father, but what that punishment shall be is not therein ascertained; though the contemporary exposition was that a corporal punishment was intended. By statute 7 Jac. I. c.4, a specific punishment (viz., commitment to the house of correction) is inflicted on the woman only. But in both cases it seems that the penalty can only be inflicted if the bastard becomes chargeable to the parish; for otherwise the very maintenance of the child is considered as a degree of punishment." Book IV, Chap. IV, XI.

"The court of general quarter sessions of the peace is a court that must be held in every county once in every quarter of a year, . . . It is held before two or more justices of the peace, one of which must be of the quorum. The jurisdiction of this court, by statute 34 Edw. III. c.1, extends to the trying and determining all felonies and trespasses whatsoever, though they seldom if ever try any greater offence than small felonies within the benefit of clergy; their commission providing that, if any case of difficulty arises, they shall not proceed to judgment but in the presence of one of the justices of the court of king's bench or common pleas, or one of the judges of assize. And therefore murders and other capital felonies are usually remitted, for a more solemn trial, to the assizes. They cannot also try any new-created offence without express power given them by the statute which creates it. But there are many offences and particular matters which by particular statutes belong properly to this jurisdiction, and ought to be prosecuted in this court; as the smaller misdemeanours against the public or commonwealth not amounting to felony, and especially offences relating to the game, highways, alehouses, bastard children, the settlement and provision of the poor, vagrants, servants' wages, apprentices, and popish recusants [Lambard's Eirenarcha and Burn's Justice]. Some of these are proceeded upon by indictment, and others in a summary way by motion and order thereupon; which order may for the most part, unless guarded against by particular statutes, be removed into the court of king's bench by a writ of certiorari facias, and be there either quashed or confirmed." Book IV, Chap. XIX. 1.8.

"We are next, according to the plan I have laid down, to take into consideration the proceedings in the courts of criminal jurisdiction in order to the punishment of offences. These are plain, easy, and regular; the law not admitting any fictions, as in civil causes, to take place where the life, the liberty, and the safety of the subject are more immediately brought into jeopardy. And these proceedings are divisible into two kinds, summary and regular; of the former of which I shall briefly speak before we enter upon the latter, which will require a more thorough and particular examination.

By a summary proceeding I mean principally such as is directed by several acts of parliament (for the common law is a stranger to it, unless in the case of contempts) for the conviction of offenders and the inflicting of certain penalties created by those acts of parliament. In these there is no intervention of a jury, but the party accused is acquitted or condemned by the suffrage of such person only as the statute has appointed for his judge,—an institution designed professedly for the greater ease of the subject by doing him speedy justice, and by not harassing the freeholders with frequent and troublesome attendances to try every minute offence. But it has of late been so far extended as, if a check be not timely given, to threaten the disuse of our admirable and truly English trial by jury, unless only in capital cases.

\* \* \* \* \* \*

II. Another branch of summary proceedings is that before justices of the peace, in order to inflict divers petty pecuniary mulcts and corporal penalties denounced by act of parliament for many disorderly offences, such as common swearing, drunkenness, vagrancy, idleness, and a vast variety of others, for which I must refer the student to the justice-books formerly cited [Lambard and Burn], and which used to be formerly punished by the verdict of a jury in the court-leet." Book IV, Chap. XX.

The following excellent description of the historical background, though written with reference to the federal constitutional guaranty of trial by jury in "all criminal prose-

cutions," is also relevant here, Frankfurter and Corcoran, *Petty Federal Offenses and the Constitutional Guaranty of Trial by Jury,* 39 Harv.L.Rev. 917, 921 et seq. (1926) (selected footnote in brackets):

"Here, as in other constitutional instances of procedural safeguards, we are not dealing with abstract declarations about 'the rights of man' but with the preservation of concrete institutions, the details of which, because of their familiarity, were taken for granted and not defined by the framers. These requirements for trial by jury have a historic genealogy which, while it may not exclude acquired characteristics of meaning, certainly determines the constitutional direction of these clauses. The canon of construction invoked by the present Chief Justice in another connection is an indispensable guide to the solution of our problem:

'The language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions as they were when the instrument was framed and adopted. The statesmen and lawyers of the Convention who submitted it to the ratification of the Conventions of the thirteen States, were born and brought up in the atmosphere of the common law, and thought and spoke in its vocabulary. They were familiar with other forms of government, recent and ancient, and indicated in their discussions earnest study and consideration of many of them, but when they came to put their conclusions into the form of fundamental law in a compact draft, they expressed them in terms of the common law, confident that they could be shortly and easily understood.'

But of course the 'common law' was not a static set of detailed rules. It was a moving development. Particularly where law and politics mingled, legislation constantly shifted its boundaries, with resulting doubts and ambiguities as to the particular 'common law' prevailing at a particular time. Modern research has shed powerful light upon many dark places which furnished soil for fictions and myths about the common

law. Moreover, while the Constitution was written in 1787, it was not written for 1787. Its language, while rooted in the concrete experience and practices of the framers, may spread beyond into fresh soil. Historic continuity in constitutional construction does not necessarily mean historic stereotype in application. To what extent respect for continuity demands adherence merely to what was, involves the art of adjudication—raises those questions of more or less that ultimately decide cases. This is the judge's function, not ours. But in striking the final balance, the claims of history, in a case presenting the problem under discussion, will weigh heavily. Upon our point too, perhaps, 'a page of history is worth a volume of logic.' At all events, our endeavor is to furnish that page of history. What evidence do we find 'in the atmosphere of the common law,' in which the framers of the Constitution 'were born and brought up', which explains the requirement of trial by jury in 'crimes' and 'criminal prosecutions'? This atmosphere must be reproduced if we are to understand what the framers were about in their insistence on trial by jury for 'crimes.' Only after this history speaks with clear accents do we encounter the practical issues of its observance—the domain of legislature and courts which we shall not enter.

That the modern institution of trial by jury derives from Magna Carta is one of the most revered of legal fables. The belief is an obstinate example of 'the inevitable habit of reading later ideas into earlier institutions.' Magna Carta neither granted nor guaranteed trial by jury. The forms of the modern jury had not taken shape by 1215, although the principles from which they were to evolve found expression after the Norman Conquest. Modern scholarship has abundantly established that the judicium parium of the famous chapter 39 was not our verdict on the facts of 'twelve good men and true.' It was the ancient protection of the free Norman whenever embroiled with the law, whereby his peers, and not merely a king's justice, should determine what ordeal was to test his rights and how he should perform it. But the tradi-

tional interpretation of the chapter, though 'based on insecure historical foundations,' has 'proved of supreme value in the battle of freedom', so largely won through insistence on procedural safeguards.

To the Englishman of the fourteenth century, however, it had already become an 'ancient prerogative' to have twelve laymen stand between him and the vengeance of the king in a criminal prosecution of any kind, whether the charge were tippling at the inn or murder. When, therefore, in the early 1300's justices of the peace became the local criminal courts of the realm, they administered the law in all cases through the inquisition of a grand jury and the verdict of a petit jury. However small the offense or pressing the need for the speedy disposal of insignificant cases, the offender and the community had to bear the delay and the cost of the deliberations of juries, and enjoyed whatever protection they afforded. The story of these justices' courts reveals a constant effort to adjust the machinery of jury trial with the volume of litigation which came before the Sessions. The steady increase of criminal statutes early forced the Sessions to meet at regular quarterly intervals. But soon even Quarter Sessions could not dispose of the petty criminal business with the cumbersome and formal mechanism of grand and petit juries. Henry VII, a 'strong' king, applied measures of relief. Penal statutes of his reign begin the restriction of the grand jury's scope of action by authorizing justices to initiate prosecutions upon private information as well as by indictment, and by encouraging informations through the grant of a moiety of the penalty to the informer. There is high authority for the belief that Henry VII's legislation also greatly curtailed the ancient role of the trial jury. For by II Hen. VII, c. 3, the justices were authorized upon information 'by their discretion to hear and determine all offenses and contempts,' other than felonies. On its face this does not necessarily exclude the jury. It may be that the only change was to eliminate presentment by grand jury and substitute information. Coke's gloss, how-

ever, attributes to this statute 'most grievous and heavy oppressions . . . by information only without any presentment or trial by jury,' i. e., petit jury. This statute upon Henry VII's death was promptly repealed. The recital of the repeal based it on the flood of false informations to which the act gave rise. But Coke, whose learning was not free from the slant of politics, finds in the repeal a vindication of trial by jury.

However, the accumulating criminal business of the Sessions again demanded attention. Henry VIII resorted to the palliative of increasing the frequency of the Sessions. But the cost and inconvenience of the 'calls upon the country' for additional petit juries proved unbearable. The device was abandoned 'forasmuch as the King's most loving Subjects are much travailed and otherwise encumbered in coming and keeping of the said six Weeks Sessions, to their Costs, Charges, Unquietness.' Parliament yielded to the necessities of the situation. As offenses increased, in order to avoid the inconvenience of postponing the trial of small offenses to Quarter Sessions, with intervening commitment of the accused or the making of resented calls upon the country by assembling juries at shorter intervals, justices were entrusted out of Sessions, whenever and wherever they might be found, with the power to determine urgent but minor delinquencies without intervention of juries.

The experience which the legislation of Henry VII had provoked bit deep into the memory of Parliaments. Despite the pressure for effective administration of criminal justice, they withheld for a long time any comprehensive dispensation with jury requirements. But legislation made piecemeal inroads upon trial by jury. In new penal statutes, Parliament gradually adopted the practice of providing that convictions under them should be by one or more justices. A mass of prohibitions against petty disorders, swearing, drunkenness, embezzlement, wage-bargainings and the like, led to frequent grant of this summary power to the justices. This process of nibbling away the traditional procedure was gradually applied to offenses of greater moment. After the Restoration, by the First Excise Acts and regulations of trade, and then by the Game Acts of Charles II, the practice insensibly became characteristic of the jurisprudence of the country. Under the dominating pressure of a practical problem in the enforcement of law it had become common practice for Parliament to except new offenses from the protection of jury procedure. And so, successive companies of colonists carried with them a conception of the scope of trial by jury which dispensed with it in cases that doubtless touched the average Englishman's experience more than any other part of the criminal law.

\*　　\*　　\*　　\*　　\*　　\*

The most striking aspect of these summary trials without juries at common law was the great volume of offenses thus treated. . . . Blackstone, writing in 1769, after enumerating a few of the more recurring offenses dealt with summarily, refers the student to the justice-books for 'a vast variety of others.' These various acts do not in terms eliminate the jury. But the sense of the legislation is clear and the practice undisputed. Authority given to the justices meant 'the justices' and not 'the justices and jury.' The great justice-book, which gathered up the accumulated practice under the statutes is explicit that they eliminated jury trial. In his classic Dr. Richard Burn, himself a 'J. P.' for Westmoreland and Cumberland, thus summarized the result:

> 'The power of a justice of the peace is in restraint of the common law, and in abundance of instances is a tacit repeal of that famous clause in the great charter, that a man shall be tried by his equals.'

'In these,' says Blackstone, relying on Lambard and Burn, 'there is no intervention of a jury, but the party accused is acquitted or condemned by the suffrage of such person only as the statute has appointed for his judge.'

\*　　\*　　\*　　\*　　\*　　\*

The colonial charters guaranteed settlers the liberties and immunities of Englishmen and defined legislative power by the laws of

England. The newcomers brought with them the legal traditions of James I, of which summary jurisdiction by justices of the peace was a familiar part. Then followed the task of adapting English law to American soil; the old material had to be transformed, not merely transplanted. This was true of the colonial law concerning the powers of magistrates. The colonies did not blindly reproduce English procedure. Primitive settlements across the sea furnished no provocations for conferring magisterial powers upon a justice of the peace similar to the complexities of the elaborate criminal statutes and the centralizing tendencies of the Stuarts. The need for criminal legislation in the colonies was comparatively narrow; and their sparsely settled, homogeneous societies were peculiarly adapted for dealing with wrongdoers through popular forms of justice. Inevitably, therefore, the colonies entrusted fewer matters to justices than did the contemporary English law. Inevitably, also, the English magistrates exercised wider powers of punishment than the colonies gave to their magistrates. Colonial law reflected a low economic level. Land-poor settlers could not pay large fines; man-poor communities were not likely to keep producers under long jail sentence.

Despite . . . differences, all the colonies, to some extent at least, re-lived the experience of the mother country, and resorted to summary jurisdiction for minor offenses with full loyalty to their conception of the Englishman's right to trial by jury. Only a detailed examination of the early records will yield an adequate realization of the extent and the significance of this limitation upon jury trial in the legal tradition of the colonies. . . . The meaning of the material thus revealed is subject to all the difficulties and doubts which surround old texts when deprived of the commentary of life. Living institutions, with assumptions and significances lacking formal language, must be recreated from the obscuring ambiguity of early statutory language, frequently without the aid of auxiliary evidence of legal practice. Particularly thorny is the attempt to separate formal criminal prosecutions from qui tam or civil procedure against offenders. Colonial legislatures, like Parliament, made no sharp distinction between different forms directed to the same end [This paper seeks to observe the distinction between formally different proceedings producing, as a matter of substance, the same result. Instances of criminal process initiated by the State for penalties exclusively to the State's use are distinguished from proceedings initiated by a private informer, commonly known as qui tam prosecutions, which in turn are differentiated from so-called civil actions of debt in which a penalty or forfeiture was recoverable either by the State or by a private party. The modern federal criminal law discriminates between these forms of procedure by withdrawing the constitutional requirements as to witnesses, quantum of proof, etc., from proceedings not formally criminal. . . . While these modern cases in specific instances have applied certain provisions of the federal Bill of Rights to a proceeding 'civil in form' but 'unquestionably criminal in its nature' and have held other guaranties inapplicable, certain it is that the practice of the common law did not discriminate so far as jury trial was concerned between a formal criminal prosecution and a proceeding 'unquestionably criminal in its nature.']."

I now turn to the following entry in *Some Records of Sussex County, Delaware,* compiled by C.H.B. Turner (Phila.1909) at pp. 65, 69:

"March 14th, 15th, 1681.

Att A Court Held at Deale for the Towne and County of Deale By the Kings Authority the 14th and 15th days of the Moneth Called March Anno Dm: 1681–82; Justices present; Luke Wattson John Roades John Kiphaven William Clark."

\*   \*   \*   \*   \*   \*

"The Grand Jurey present John oakey for haveing a strang Child at his house which is not Certainly knowen whoes it is; Henry Bowman doe Ingage to save the County Harmless from being put to

any Charge for the maintaining of the said Child." [2]

Records of other cases at this session show that the justices conducted jury trials. Other records show that soon after receiving title to the land from the Duke of York on August 24, 1682, William Penn reappointed the same men who sat at this session to be "Justices of the peace And Court of Judicature for the County of Whore Kills Als New Deal . . . which my will and pleasure is shall from hence forth be Called by the name of Sussex." See pp. 80, 81, 82.

In *State v. Noble West*, Quarter Sessions, 1 Del.Cases 84 (1796), the defendant moved for an order in arrest of judgment after a guilty verdict on an indictment found November 1795 charging fornication under "An act against fornication and adultery." 1 Del.Laws 105 (1726–1736). The defendant argued that the court could not impose punishment because the act under which he was indicted had in the meantime been repealed by a new act, 2 Del.Laws 1304 (February 9, 1796), which expressly bars any fine, forfeiture, or corporal punishment for bastardy or fornication. The defendant argued further that the court had no power to enter an order of maintenance because 18 Eliz. c. 3 (1576) "had not been considered as binding here." The court, by Bassett, C. J., rejected the defendant's contention as follows:

> "We are of opinion that the reasons filed in this cause are not sufficient to prevent the court from making an order for maintenance and indemnifying the county as formerly. The Court have no power to pass judgment of the fine and forfeiture, for it is taken from them by this Act [2 Del.Laws 1304 (1796)], but the power relative to the order is not taken away by the Act. It is a question whether the Sessions did not exercise the practice of ordering the maintenance previous to the Act [1 Del.Laws 105 (1726–1736)]. We think they did, they certainly have ever since. This Act does not prevent our acting [on] the business begun before the Act as to the order."

These sources show that in England justices of the peace conducted both summary proceedings, without juries, and regular proceedings, with grand and petit juries. I do not have the necessary sources, in particular Burn and Lambard, to say for certain whether the issue of paternity was triable by jury in England. It seems likely that it was, since 18 Eliz. c. 3 (1576) was enacted long before the Restoration (1660), when the practice of granting summary jurisdiction to justices of the peace became characteristic. As stated in McVicker, *The Seventeenth Century Justice of Peace in England*, 24 Ky LJ 387, 410 (1936): "there were but few statutes giving summary powers to justices in force [in the 17th century], and a court of petty sessions administering a summary jurisdiction had not yet developed."

The U. S. Supreme Court has recently recognized that jury trials deriving from the sessions of the justices of the peace, which was not a "common law court" in the narrow sense of the term, is nonetheless protected by the constitutional guaranty, in *Pernell v. Southall Realty*, 416 U.S. 363, 381, 94 S.Ct. 1723, 1732, 40 L.Ed.2d 198 (1974):

> "History plainly reveals that a trial by jury before a justice of the peace in England . . . was a jury trial in the full constitutional sense. English justices of the peace were required to be learned in the law. They were judges of record and their courts, courts of record. The procedures they followed differed in *no* essential manner from that of the higher court of assize held by the King's judges. Trial by jury before the justices of the peace proceeded in the usual manner of a criminal trial by jury in the King's court."

■ Whatever the practice was in England, our concern is with the practice here. Frankfurter and Corcoran explain that the colonists tended to limit the power of justices of the peace in favor of the more popular trial by jury. Since the act at 1 Del.Laws 105 (1726–1736) does not provide

---

2.  Mr. Carrad deserves commendation for finding this early record.

for an order of maintenance, the opinion of Richard Bassett, who was a member of the state constitutional conventions of 1776 and 1792, is high authority that 18 Eliz. c. 3 (1576) was "adopted in practice" here, as provided in the Constitution of 1776, Art. 25. Just as the provision for an order of maintenance in the 1796 act codified the former practice, it is likely that the reference to "the verdict of the jury" in the 1796 act codified the former practice, as usual in early statutes. Finally, the 1681 court record is important confirmation that the practice here was regular, with indictment by grand and trial by petit jury. It is unlikely that the use of juries lessened thereafter. For a discussion of the laws guarantying jury trial during that period, see *Commonwealth v. Maxwell*, Pa.Supr., 271 Pa. 378, 114 A. 825 (1921). This evidence is at least as strong as the evidence from which the court in *Nance v. Rees* concluded that the English statute on special juries was adopted in practice here before 1776. I therefore conclude that 18 Eliz. c. 3 was adopted in practice here before 1776 and the issue of paternity was tried by jury.

The appellees contend that even if juries decided paternity in bastardy proceedings, the right is not preserved because the new proceedings are no longer criminal in nature. Before discussing this issue, it is helpful to outline the somewhat confusing statutory background.

The former statutes relating to the duty of a father to support his children derived from three sources: (1) 13 *Del.C.* 1953 § 702, which stated the general civil obligation of support, derived from 44 Del.Laws c. 159, § 1 (1943). *Spruance v. Spruance*, Del. Chanc., 113 A.2d 877, 878 (1955). (2) 13 *Del.C.* 1953 § 502, which made wilful refusal to maintain one's illegitimate child a misdemeanor carrying a fine of not more than $500 or imprisonment for not more than one year, derived from 18 Del.Laws c. 229, § 1 (1887), but did not apply to illegitimate children until 27 Del.Laws c. 262, § 1 (1913). Many of the cases discussing the quasi-criminal nature of bastardy proceeding refer to this statute. See, for example, *In re Alexander*, Del.Super., 36 A.2d 361

(1944); *State v. Kempner*, Del.Super., 138 A.2d 504 (1958); *State v. Grace*, Del.Supr., 286 A.2d 754 (1971). (3) Illegitimacy proceeding under 13 *Del.C.* 1953 c. 13, subchapter II derived from 7 Del.Laws 227 (1829), 2 Del.Laws 1304 (1796), and ultimately 18 Eliz. c. 3 (1576). This is the only act deriving from a source before 1776. We are here concerned with it.

Proceedings under this act were a "strange hybrid," as were proceedings under its predecessor, 18 Eliz. c. 3 (1576). In *State, on Complaint of Johnson v. Wright*, Del.Gen.Sess., 3 A.2d 74 (1938), Judge Rodney analyzed the proceedings thus:

> "Most of the cases holding the proceedings civil in nature are based upon the theory that the Court in determining the nature of the action looks not so much to the form of procedure, but to the end to be attained. These Courts consider that the purposes of the statute are not so much to punish the man for begetting a bastard as to impose upon him the obligation to care for the infant and to protect the public from the cost of maintenance. There is much merit in these conclusions, and the difficulty lies in attempting to formalize or standardize certain purely statutory proceedings which refuse to be classified in any known and fixed groups.

> \*  \*  \*  \*  \*  \*

> The primary object of the statute as I view it, is that the maintenance of the child should be borne by him who was responsible for its existence, and the State furnishes the machinery in its own name to compel such maintenance.

> The proceeding is not based on contract and does not sound in tort. It is a police regulation of a statutory character, for the enforcement of which the State extends its criminal process. Largely because a conviction is not followed by a fine in presenti or by imprisonment but by an order requiring the defendant to pay an amount from Fifteen to Forty Dollars a month until the child is sixteen, the Courts have hesitated to call it a strictly criminal proceeding and have

termed it 'quasi criminal', viz., that it is not identical with criminal proceedings but is sufficiently similar thereto to be classed with them, and this terminology I think is correct."

█ Like most distinctions in law, the one between civil and criminal actions is ultimately a matter of degree. Frankfurter and Corcoran explain above that the distinction was often blurred in the past. Perhaps bastardy proceedings were criminal in form because of the public's interest in preventing the support of illegitimate children from becoming a public expense.[3] Perhaps it is historical accident. Whatever the reason, we must try to look behind labels to the underlying nature of the proceedings. Wysong, *The Jurisprudence of Labels—Bastardy as a Case in Point*, 39 Neb.L.R. 648 (1960). Unlike the burden of proof and various aspects of process and procedure, the right to jury trial does not depend on whether an action is criminal or civil. There is a right to jury trial in civil as well as criminal actions. Whether there is a right to jury trial in the new civil enforcement proceedings depends on whether the difference between the proceedings where juries were used before the guaranty was adopted and the new proceedings is one of form or substance. 47 Am.Jur.2d, Jury, § 18; *Hopkins*, 342 A.2d at 246.

Neither 18 Eliz. c. 3 nor the former Delaware statute provide for punishment in the normal sense of the term, except insofar as "maintenance of the child is considered as a degree of punishment." Both provide for commitment of the father only if he does not give bond or comply with the order of maintenance. Similarly, the 1974 act provides that if the court finds that a defendant has violated a civil support order, it "may punish such defendant for contempt." 13 *Del.C.* § 516(a). The purpose of both the former and the present proceedings is to enforce the same duty of support and both use the same sanction to accomplish it. I therefore conclude that the new civil proceeding is different in form, but the same

as the former quasi criminal proceeding in substance.

I recognize that most of the courts that have decided this issue have held that there is no constitutional right to jury trial of the issue of paternity in civil proceedings. *State v. Pinkerton*, Kan.Supr., 185 Kan. 68, 340 P.2d 393 (1959); *Commonwealth v. Dillworth*, Pa.Super., 204 Pa.Super. 420, 205 A.2d 111 (1964), reversed on other grounds, Pa.Supr., 431 Pa. 479, 246 A.2d 859 (1968); *Smeido v. Jansons*, N.Y.App.Div., 23 A.D.2d 796, 259 N.Y.S.2d 169 (1965); *McGlohon v. Harlan*, S.C.Supr., 254 S.C. 207, 174 S.E.2d 753 (1970); *Comish v. Smith*, Idaho Supr., 97 Idaho 89, 540 P.2d 274 (1975); but see, *Waddell v. State*, Ark.Supr., 235 Ark. 293, 357 S.W.2d 651 (1962). Without discussing the cases individually, I will simply note that some of them are based on different historical backgrounds and some of them are based on the following reasoning, which I have already shown to be faulty: the guaranty preserves the "common law" right to jury trial, there was no duty to support illegitimate children at "common law," therefore there is no constitutional right to jury trial.

The appellees contend that the modern policy is that the use of a jury is not suitable in cases of this nature, citing the Uniform Parentage Act. 9A Uniform Laws Annotated 606. The commissioners' comment to § 14 of that act, which includes a provision that "the trial shall be by the court without a jury" in brackets, says as follows:

"Subsection (a) makes it clear that the action to establish paternity is a civil action. A number of states have continued to view the action as criminal or quasi-criminal, although a majority of states now treats the paternity action as a civil proceeding.

＊　　＊　　＊　　＊　　＊　　＊

The use of a jury is not desirable in the emotional atmosphere of cases of this nature. The clause eliminating the jury is

---

**3.** I note that the State is prosecuting these civil enforcement proceedings on assignment from

the mothers, who are receiving public assistance.

bracketed only because in some states constitutions may prevent elimination of a jury trial in this context."

In this connection, it is instructive to compare the test fashioned by the U.S. Supreme Court. See Schopler, Annotation, Supreme Court's Construction of Seventh Amendment's Guaranty of Right to Trial by Jury, 40 L.Ed.2d 846 (1975). The federal test is also historical, but one of the factors considered is "the practical abilities and limitations of juries." *Ross v. Bernhard,* 396 U.S. 531, 538, 90 S.Ct. 733, 738, 24 L.Ed.2d 729, (1969). It extends the guaranty to an action enforcing an entirely new statutory right, so long as it is a "legal" right enforceable in the ordinary courts of law. *Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974). The state test, on the other hand, is static. Its compensating virtue is its certainty, at least to the extent that the available records permit the necessary historical finding to be made with certainty. James, *Right to a Jury Trial in Civil Actions,* 72 Yale L.J., 655, 664 (1963). Under the state test, the court is concerned with history, not policy. Since the appellees have made this argument, I would nevertheless observe that appeals to this court for a jury trial of the issue of paternity have been infrequent in the past, they are usually short, the decision often rests on the credibility of the witnesses, and the subject is within the experience of most jurors. See 2 Schatkin, *Disputed Paternity Proceedings* (Matthew Bender, Rev. Ed.) § 24.54.

█ There is another issue that I have not yet discussed. It was stated above that the test is whether there were jury trials when the constitutional guaranty was adopted. Where there have been successive constitutions, it is often stated that the scope of the right is determined by the practice before the first constitution. 47 Am.Jur.2d, Jury, § 18. Unless a claim of constitutional right is based on extension of trial by jury to a new class of cases in the interval between successive constitutions, as in *In re Moynihan,* Mo.Supr., 62 S.W.2d 410 (1933) and *Town of Montclair v. Stanoye-*

*vich,* N.J.Supr., 6 N.J. 479, 79 A.2d 288 (1951), statements of this rule are dicta. Thus, *Nance v. Rees,* 161 A.2d at 800, says, "the general practice of trial by special jury precedes our first Constitution and must, therefore, be held to be consistent with it." The holding of *Hopkins* that the guaranty preserves the right to trial by a jury of three in summary possession proceedings, on the other hand, is based on the practice in 1897:

"In 1871 the General Assembly reduced the number of jurors available in summary eviction proceedings from twelve to three. (14 Del.L.Ch. 86). Thus at the time of the adoption of the present State Constitution (1897) such proceedings were triable before a jury of three persons and remained so until the 1972 statute here under attack." 342 A.2d at 245.

Unless there is some basis for distinguishing this holding, for example, on the ground that the number of jurors is not within the constitutional guaranty or that the scope of the right can be narrowed but not widened by developments after the first constitution, *Hopkins* is inconsistent with the rule that the practice before the first constitution controls.

Since the test is historical, it is important to know the date for determining the scope of the right. Is it the first constitution, the second constitution, where "[t]rial by jury shall be as heretofore" appears for the first time, or the constitution now in effect? Having concluded that the practice existed before 1776, I need not decide this issue; but since the practice before 1796 must be inferred from incomplete records, whereas there has been a statutory right to jury trial since 1796, there is an apparent inconsistency between *Nance v. Rees* and *Hopkins,* and the question is important, I will nevertheless discuss it.

The plain meaning of "heretofore" is "before this" or "up to this time." Webster's Third New International Dictionary (C. & C. Merriam Company 1971). This is how I understand the following statement during the discussion of the clause in the constitutional debates: " 'heretofore' must mean

something and as I take it, it means what existed at the time that was adopted." 4 Const. Debates 1897, p. 2389. One of the reasons for adopting a new constitution is to bring it up to date with developments since the last constitution. Whereas the practice before 1776 is often uncertain because of inadequate records, we can readily determine the practice in 1897 and we may assume that those who adopted the constitution were familiar with it. Thus, in *Hopkins* the court said, "it would appear that the tacit approval of a Constitutional Convention is of utmost significance." 342 A.2d at 246. It is no less significant that the practice of using juries to try the issue of paternity existed long before the constitution was adopted in 1897. This practice represented the current judgment of the people as to when there should be a right to trial by jury. By ignoring this and determining the scope of the right by the practice before 1776 instead, we compound the disadvantage of the static historical test as compared with the elastic test used by the federal courts. For these reasons, I conclude that the constitutional guaranty should be interpreted to mean "trial by jury shall be as before 1897."

■ There is a motion to dismiss one of the appeals on the ground that it was incorrectly filed in accordance with the procedure for criminal instead of civil proceedings. This was done in reliance on the former practice, as recently confirmed by *G. L. v. S. D.,* Del.Super., 382 A.2d 252 (1977), which was reversed by the Supreme Court after the appeal was filed. Looking at the contents of the pleadings and the notice given, there was substantial compliance with the requirements of the civil rules. The motion to dismiss on this ground is therefore denied.

Since I have concluded that there is a constitutional right to jury trial of the issue of paternity on appeal, when jury trial is demanded the appeal must come to this court. Compare *Wilson v. Oldfield,* Del. Comm.Pleas, 1 Del. Cases 622 (1818); *Clements v. Family Court,* Del.Supr., 401 A.2d 72 (1979). The motions to transfer the appeals to the Supreme Court are therefore denied and the court will schedule jury trials of the issue of paternity.